# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

ROBERT HENSON                                                                               PLAINTIFF

v.                                              No. 4:09CV00440 JLH

HAWKER BEECHCRAFT CORPORATION
and HAWKER BEECHCRAFT SERVICES, INC.                            DEFENDANTS

## OPINION AND ORDER

Following his termination from Hawker Beechcraft Corporation, Robert Henson commenced this action against Hawker Beechcraft Corporation and Hawker Beechcraft Services, Inc., for the tort of outrage and alleged violations of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-101 *et seq*. The defendants have filed a motion for summary judgment, and the plaintiff has responded. For the following reasons, the defendants' motion for summary judgment is granted.

### I.

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005). The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party carries its burden, the nonmoving party must "come forward with 'specific facts

showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1985) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). A genuine issue for trial exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

## II.

Defendant Hawker Beechcraft Corporation ("HBC") manufactures aircraft for general aviation and military use. The primary manufacturing plant is in Wichita, Kansas, and there is also a facility in Little Rock, Arkansas, where aircraft completion and modification tasks are performed. Defendant Hawker Beechcraft Services ("HBS") provides maintenance, repairs, and services to aircraft manufactured by HBC. HBC and HBS "have separate management, separate human resources departments, and separate policies." (Defs.' Ex. 1 ¶ 3.) If HBS employees perform work for HBC, HBC is billed for those services, and vice versa. (*Id.*; Normore Depo. p.20.) The two companies do, however, share common customers and a common campus, and employees are often transferred and promoted between the two entities. (Normore Depo. p.20; Tipton Depo. p.15.) Also, training sessions are often available for employees of both companies. (Tipton Depo. p.15.)

Robert Henson worked for HBS from July 2, 2001, to October 21, 2007. He was an excellent employee, and received good reviews from his supervisors at HBS. (Pls.' Exs. 3-6.)[1] In October of

---

[1]Henson also proffers a 2007 review signed by Henson and Knight on May 20, 2008, which stated that he was a hard worker and dedicated. Knight explains that, because he was not Henson's supervisor in 2007, he asked Henson to do a self-evaluation for that year. (Defs.' Ex. 7

2007, Henson applied for and was hired by HBC as team leader for the upholstery and trim shops. As a team leader, Henson supervised thirty to forty employees who made and installed seats, headliners, window panels and shades, and side panels for HBC aircraft. Of those employees, most were hourly workers. Henson also supervised the leads in each shop who were responsible for giving out work assignments and training employees.

When he started working for HBC in 2007, Henson reported to Larry Johnson. Shortly after he took the position, Larry Johnson left the company, and John Knight became the group manager over the back shops, which included the upholstery and trim shops. Knight testified that he was asked to take responsibility for the back shops because aircraft at the Little Rock facility were repeatedly failing burn tests. Burn tests are required by Federal Aviation Administration regulations to prove that aircraft meet specific standards for fire resistance. Knight also testified that he along with Mike Viscosi, to whom Knight reported, were directed to resolve the burn issue and to take steps necessary to ensure that the problem would be avoided in the future. (Defs.' Ex. 7 ¶¶ 2-4.) To handle the problem more efficiently, Knight created an aircraft status board, which showed the progress of each aircraft toward completion. He also required team leaders to do a walk around with him at least once a day to answer questions and discuss the status of each aircraft.

Knight was critical of Henson's management of the upholstery and trip shops. A large number of the burn issues were attributable to those shops, and Knight felt that the shops were disorderly and dirty, particularly since customers visiting the facility might see those shops. Knight said that he repeatedly told Henson to get those areas in order. (*Id.* ¶ 12.) Knight also said that Henson was inattentive during the walk arounds and failed to report critical information on the status

---

¶ 19.)

of the aircraft in a timely fashion. (*Id.* ¶¶ 9-11.)

During the time that Henson reported to Knight, a female co-worker, Stephanie Hurst, complained to Knight that Henson hugged her when they worked together, and she thought it was unprofessional. (Hurst Depo. pp.29-31.) Knight advised Henson not to touch his co-workers, but Henson continued to hug his co-workers, although he alleges that he only hugged women if they first initiated the contact. (*Id.* ¶ 16; Henson Depo. pp.70-71.) Hurst denies ever initiating contact with Henson. (Hurst Depo. p.56.)

Knight and others at HBC also believed that Henson did not handle personnel issues well. Henson complained to Cliff Normore, the Human Resources Manager, that some of his leads could not read blueprints, which is a necessary skill. However, Henson made no effort to either train or terminate the leads who could not read blueprints. (Defs.' Ex. 1 ¶ 9.) Henson also complained about leads fighting and causing disturbances, but he did not discipline them. (*Id.* ¶ 12.) And on one occasion, an employee in the upholstery and trim shops spray-painted a window black because the sunlight was bothering him. When he was questioned about his behavior, the employee said that Henson had given him permission to do it. Although Henson denies that he gave the employee permission to paint the window, Henson never punished the employee because he thought that painting the window was "just a childish prank," and the employee cleaned it up. (*Id.* ¶ 11; Henson Depo. pp.74-81.)

Henson complained several times to the Human Resources Department about John Knight. On May 8, 2008, Henson allegedly emailed Kathy Lusk in the Human Resources Department to tell her that Knight had yelled at the team leaders for over an hour in a meeting and that Knight had yelled at Henson because he could not get in touch with Henson one weekend when Henson was off

work. (Pl.'s Ex. 10.)[2] He complained that Knight called him frequently at home. He also told Cliff Normore that Knight "talked down" to people. (Defs.' Ex. 1 ¶ 8.) Henson testified that Knight was "direct with everybody" and that other team leaders also complained about how hard Knight was pushing them. Although he felt like Knight was picking on him in particular, Henson could not remember any specific examples of being talked down to and does not recall that Knight ever directed any derogatory language at him. (Henson Depo. pp.54-57, 68-69.)

Henson testified that he began to experience weight loss and inability to sleep in late 2007 or early 2008. He testified that, in his emails to the Human Resources Department, he reported that he was "stressed out and depressed," although to Knight, he only used the word "stressed." (*Id.* at 46, 59.) In a May 8, 2008, email to Kathy Lusk, he said that he felt "the stress and strain of trying to take care of 4 times the amount of people that one Team Leader should have." (Pl.'s Ex. 10.) He also testified that he asked Knight to help him because he was "pretty stressed out," had too much work, and wanted additional help. (Henson Depo. p.62.) On one occasion, Knight told Henson that he "appeared to be stressed out" and "needed to find some way to channel the . . . emotions." (*Id.* at 42.) In early May 2008, Henson visited his physician, Dr. Ramaswamy, because of increased migraines from work-related stress.

On May 20, 2008, Knight met with Henson to discuss concerns that Knight had about Henson's work performance. Knight testified that Henson was irritable, short-tempered, and angry, and said he did not care about the status of the airplanes. (Defs.' Ex. 7 ¶ 20; Knight Depo. pp.88-89.) Henson does not remember making that statement but says that he could have. (Henson Depo.

---

[2]The exhibit Henson provides is actually a draft email sent from Henson to Henson's own email account—not to Kathy Lusk.

p.70.) Knight testified that, after his conversation with Henson, he talked to Mike Viscosi and Cliff Normore about terminating Henson.

Henson went to see Dr. Ramaswamy again on May 22, 2008, and on May 23, Henson gave Knight a doctor's note, which stated that he needed to be off of work from May 23 to May 31 due to a "medical reason." He also informed Normore that his doctor had told him to take off work. (Normore Depo. p.40.) Knight was irritated that Henson did not notify him sooner that he needed to be off work, but he approved Henson's use of sick leave for the absences. (Knight Depo. p.62.) Henson never mentioned to Knight that he wanted to use FMLA leave, but Henson alleges that he faxed a request for FMLA leave to HBC's office in Wichita, Kansas, on May 23, 2008.

Henson returned to work on June 2, 2008. On June 3, Normore and Knight terminated Henson's employment for poor performance. The termination letter stated that Henson lacked "the ability to drive individual accountability and address performance issues." (Defs.' Ex. 9.) It also mentioned the window painting incident and the disorderly state of the upholstery and trim shops. (*Id.*) On June 9, HBC received a Certification of Health Care Provider from Henson's physician. On June 16, 2008, HBC received Henson's Request for Family Leave, which was faxed that same day. Henson had typed on the form:

> I went to the doctor on May 22, 2008. He advises that I need to start a regimen of medication to treat my work related stress which is causing depression, anxiety, migraine headaches and insomnia. He advises that I should take 1 to 2 weeks off to allow this medication to take effect. I want to get things aligned in the 2 shops I supervise (88 employees total) so that production can continue and my absence will not hurt the company. I will inform my supervisor and Human Resources in Little Rock tomorrow, May 23rd of my need to be out on sick leave starting Tuesday (Monday is Memorial day – a company holiday) and give them the signed absence note from my doctor. I have mailed my doctor the Certification Papers to complete.

(Defs.' Ex. 14.) On June 18, 2008, HBC received another copy of Henson's Request for Family

Leave. (Defs.' Ex. 15.) In both faxes, Henson or someone acting on his behalf wrote that the request was originally faxed to HBC on May 23, 2008. However, no further evidence of a May 23 fax has been provided.

On June 12, 2008, Henson filed an EEOC complaint, alleging that, on June 3, 2008, he was discriminated against due to a disability when he was discharged and that, on the same date, he was retaliated against for having requested time off work. (Defs.' Ex. 17.) The administrative charge only names HBC as the respondent, not HBS. (*Id.*)

### III.

Following his termination, Henson filed claims against both HBS and HBC. HBS seeks summary judgment on all of the claims made against it, contending that it was not Henson's employer at the time of the alleged wrongful conduct and, thus, cannot be held liable. Henson argues that HBS may be held liable because HBC and HBS constitute a single, integrated employer.

An integrated employer is comprised of two entities with (1) common management, (2) interrelation between operations, (3) centralized control of labor relations, and (4) common ownership and financial control. 29 C.F.R. § 825.104(c)(2) (2008).[3] "Although no single factor is conclusive, control of labor operations seems to be the most critical factor." *Schubert v. Bethesda Health Group, Inc.*, 319 F. Supp. 2d 963, 966 (E.D. Mo. 2004). Applying this test to the evidence, HBC and HBS are interrelated, but they do not constitute a single, integrated employer. Two

---

[3]This test, which is set forth in the FMLA regulations, is also used to determine whether an entity is an employer under the ADA. The ADA's definition of "employer" tracks that of Title VII. *Compton v. Ark. Dept. of Veteran's Affairs*, No. 4:09CV00814, 2010 WL 1875572, at *1 (E.D. Ark. May 10, 2010); *see also* 42 U.S.C. § 2000e(b); 42 U.S.C. § 12111(5)(A). The standard employed under Title VII to determine whether separate entities constitute an integrated employer is the same as that set forth in the FMLA regulations. *Baker v. Stuart Broad. Co.*, 560 F.2d 389, 391-92 (8th Cir. 1977).

entities, Goldman Sachs Capital Partners IV, LP and Onex Partners II, LP, have ownership interest in both HBC and HBS. (Pl.'s Ex. 19.) HBC and HBS share the same campus in Little Rock, Arkansas, and at that campus, employees of both companies are often invited to participate in the same training programs. However, the parties agree that HBC and HBS are separate corporate entities with separate management, separate human resources departments, and separate policies. (Pl.'s Resp. to Material Facts ¶ 4.) Employees can transfer between the companies if there is an available position, but if HBS employees perform work for HBC, HBS bills HBC for that time, and the same is true if HBC employees perform work for HBS. Although the companies share a degree of common ownership and interrelation of operations, there is no evidence of common management or that HBS's management has control over HBC's employment decisions. *Contra. Schubert*, 319 F. Supp. 2d at 968 ("[T]here is evidence in the record showing that officers at BHGI also had control over BLTCI's employment decisions.")

      Furthermore, at no time prior to his termination did HBC and HBS jointly employ Henson. Joint employment encompasses situations in which "two or more businesses exercise some control over the work or working conditions of the employee." 29 C.F.R. § 825.106(a). "In a joint employer relationship the analysis assumes separate legal entities exist but that they have chosen to handle certain aspects of their employer-employee relationships jointly." *Schubert*, 319 F. Supp. 2d at 970 (citing *NLRB v. Browning-Ferris Indus. of Penn., Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982)). Joint employment generally exists in three situations: (1) when there is an arrangement between employers to share an employee's services; (2) when one employer acts directly or indirectly in the interest of the other employer in relation to the employee; and (3) when the employers are not completely disassociated with respect to the employee's employment and share control of the employee. 29

C.F.R. § 825.106(a).  Although the regulations do not provide much guidance to assist courts in defining the parameters of a joint employment relationship, the Ninth Circuit and at least one district court have found case law and regulations from the Fair Labor Standards Act ("FLSA") as persuasive.  *See Moreau v. Air France*, 356 F.3d 942, 946 (9th Cir. 2004) ("[T]he FMLA joint employer regulation mirrors the wording of the FLSA joint employment regulations."); *Schubert*, 319 F. Supp. 2d at 970 (citing *Moreau*, 356 F.3d at 946).  Under the FLSA, courts consider "the control of hiring and firing of employees, control of the manner in which work is performed, and the fixing of employee wages in determining who is the 'employer.' " *Dole v. Cont'l Cuisine, Inc.*, 751 F. Supp. 799, 802-03 (E.D. Ark. 1990) (citing *Wirtz v. Pure Ice Co.*, 322 F.2d 259 (8th Cir. 1963); *Fruco Constr. Co. v. McClelland*, 192 F.2d 241 (8th Cir. 1951)).  Here, Henson offers no evidence that HBS had the power to hire and fire HBC employees, control the method of operation at HBC, set hourly wages, or control the payroll.  Those responsibilities are performed exclusively by the management of HBC.  In light of these facts, HBS is not Henson's "employer," and HBS is entitled to summary judgment on all of Henson's claims against it.  *See Dole*, 751 F. Supp. at 803 (finding that a defendant was not employer because he could not hire and fire employees, control the methods of operation, set wages, or control payroll).

## IV.

**A.     Outrage Claim**

Likewise, HBC is entitled to summary judgment on the plaintiff's outrage claim.  That claim requires evidence: (1) that the defendant intended to inflict emotional distress; (2) that the conduct was extreme and outrageous, beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) that the defendant's actions caused the plaintiff's distress; and (4) that

9

the emotional distress sustained was so severe that no reasonable person could be expected to endure it. *Burkhart v. Am. Railcar Indus., Inc.*, 603 F.3d 472, 478 (8th Cir. 2010); *Kiersey v. Jeffrey*, 369 Ark. 220, 222, 253 S.W.3d 438, 441 (2007). The Arkansas Supreme Court "gives a narrow view to the tort of outrage, and requires clear-cut proof to establish the elements in outrage cases." *Kiersey*, 369 Ark. at 222, 253 S.W.3d at 441. The tort of outrage "should not and does not open the doors of the courts to every slight insult or indignity one must endure in life." *Id.* (quoting *Crockett v. Essex*, 341 Ark. 558, 564, 19 S.W.3d 585, 589 (2000)). "A plaintiff does not meet the burden if his complaint merely describes 'insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' " *Sharbine v. Boon Exploration, Inc.*, No. 09-CV-1025, 2010 WL 892117, at *2 (W.D. Ark. Mar. 9, 2010) (quoting *Seals v. Corr. Med'l Servs., Inc.*, 473 F. Supp. 2d 912, 925 (E.D. Ark. 2007)).

Here, the plaintiff has alleged facts that, even if true, do not meet the criteria for the tort of outrage in Arkansas. Henson contends that Knight, his supervisor, yelled at him, questioned whether Henson was laughing at him when Henson was laughing about something else, and questioned why Henson did not answer the phone when Knight called him at home one weekend. Henson also alleges that Knight threatened him at some point during his employment. However, rude or profane language and threats are not enough to sustain a claim for the tort of outrage. *Holloman v. Keadle*, 326 Ark. 168, 175, 931 S.W.2d 413, 417 (1996) (finding that an employer's repeated curses, racial slurs, degrading remarks and threats of violence were not sufficient to state a claim for the tort of outrage). Although Knight was aware that Henson was stressed, there is no evidence that Knight exploited Henson's mental state for the purpose of inflicting emotional distress. HBC is entitled to summary judgment on the plaintiff's outrage claim.

**B.    FMLA Claims**

   **1.  Retaliation Claim**

HBC also seeks summary judgment on Henson's FMLA retaliation claim. An employer may not consider "an employee's use of FMLA leave as a negative factor in an employment action." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (citing *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002)). An employee can prove retaliation through circumstantial evidence using the *McDonnell Douglas* burden-shifting analysis. *Id.* To establish a *prima facie* case of retaliation, Henson must show (1) that he engaged in a statutorily protected activity, (2) that he suffered an adverse action subsequent to this activity, and (3) that there was a causal link between the protected activity and the adverse action. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973)). If Henson establishes a *prima facie* case, the burden shifts to HBC to present a legitimate, non-discriminatory reason for Henson's termination. *Id.* Once HBC provides such a reason, the burden shifts back to Henson to demonstrate that the stated reason was merely a pretext for retaliation. *Id.* Henson must present evidence that "(1) creates a question of fact regarding whether [the defendant's] reason was pretextual and (2) creates a reasonable inference that [the defendant] acted in retaliation." *Id.* (quoting *Smith v. Allen Health Sys.*, 302 F.3d 827, 833 (8th Cir. 2002)).

HBC argues that Henson cannot establish a *prima facie* case of retaliation because Henson did not seek FMLA leave prior to his termination, which occurred on June 3, 2008. "A claim under the FMLA cannot succeed unless the plaintiff can show that he gave his employer adequate and timely notice of his need for leave . . . ." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 991 (8th Cir. 2005).

Henson argues that HBC knew he needed FMLA leave because the company was aware that he was feeling stressed and depressed and knew that he was taking leave because of stress. To provide an employer with notice, an employee need not mention the FMLA by name; rather, the employee must simply indicate both the need and the reason for the leave. *Sanders v. May Dept. Stores Co.*, 315 F.3d 940, 944 (8th Cir. 2003). The employee must provide the employer with enough information "to suggest that his health condition could be serious." *Scobey v. Nucor Steel-Ark.*, 580 F.3d 781, 786 (8th Cir. 2009) (quoting *Woods*, 409 F.3d at 990). The doctor's note that Henson submitted to Knight said that Henson was advised to remain off work for a "medical reason." (Defs.' Ex. 8.) Henson alleges that, when he gave Knight the note, he told Knight that he needed to be off of work for "stress." (Henson Depo. p.89.) Normore, the Human Resources Director, also understood that Henson was taking time off for stress. (Pl.'s Ex. 16.) Henson did not tell Knight that he was depressed. (Henson Depo. p.46.) Although Henson suggests that he told someone at HBC that he was "stressed out and depressed" (Henson Depo. p.59), he cannot recall when he made those statements or to whom. Even if he had used the word "depressed" in a conversation with someone at HBC, that would not be enough to put HBC on notice that he had a serious health condition. *Rask v. Fresenius Med'l Care N. Am.*, 509 F.3d 466, 473 (8th Cir. 2007) ("We therefore think that [the plaintiff] would need to apprise [her employer] of more than the mere fact that she had been diagnosed with something called 'depression' to put them on notice that she had a serious health condition."). Nor would it be enough to put HBC on notice that Henson was requesting FMLA leave. *See Woods*, 409 F.3d at 992-93 (affirming summary judgment for the employer in an FMLA action where the employee left voice mail messages stating he was seeing a doctor, and ten days later explained he was absent from work because he was stressed, but prior to

his termination, never provided medical documentation indicating that the absence was due to a serious health condition).

Henson also alleges that HBC was notified of his need for FMLA leave when he faxed his FMLA leave request form to HBC on May 23, 2008. HBC argues that it never received that fax. HBC offers as evidence two copies of Henson's FMLA leave request form, which were faxed to HBC on June 16, 2008, and June 18, 2008. On the last page of the June 16 fax, Henson or someone acting on his behalf wrote, "Page 1 originally faxed on May 23, 2008. Please confirm receipt via email to robt_henson@sbcglobal.net." (Defs.' Ex. 14.) On the first page of the June 18 fax, someone wrote, "Page 1 originally faxed on May 23, 2008. Again on June 16, 2008. Please confirm receipt via email to robt_henson@sbcglobal.net." (Defs.' Ex. 15.) On the form itself, Henson wrote, "I will inform my supervisor and Human Resources in Little Rock tomorrow, May 23rd of my need to be out on sick leave." (Defs.' Exs. 14-15.) Based on this evidence, there is a factual dispute as to whether Henson informed HBC that he was seeking FMLA leave prior to his termination.

Regardless whether Henson provided proper notice to HBC, he fails to present any evidence that HBC's legitimate, non-discriminatory reason for terminating his employment—poor performance—is pretext for retaliation.

> An employee may prove pretext by demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies.

*Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006). Although Henson points out that he was terminated only one day after returning from sick leave, "[t]iming alone is insufficient to

13

show a pretextual motive rebutting a legitimate, non-discriminatory reason for an adverse employment action." *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 916 (8th Cir. 2006). Henson also points out that he received a favorable annual review for 2007 and a raise just a week before he was terminated. However, Knight testified that, because he was not Henson's supervisor in 2007, he allowed Henson to perform a self-evaluation. (Defs.' Ex. 7 ¶19.) Furthermore, Stephanie Hurst testified that raises at HBC are not based on performance but on the availability of funds for a given period. (Hurst Depo. p.33.) That Henson received a pay raise prior to his termination does not mean that he was performing well as a team leader.

Nor does any alleged change in HBC's explanation for terminating Henson support an inference of retaliation. Henson's termination letter stated that he was being terminated because he did not hold his leads accountable, address performance issues, or keep his shops in order, and because Knight "lost confidence in [Henson] as a leader." (Defs.' Ex. 9.) Knight testified that the decision to terminate Henson was essentially made on May 20, 2008, after Henson told him he did not care about the progress of the airplanes. (Knight Depo. p.108.) During the EEOC investigation, Normore mentioned the same performance issues that were described in the termination letter and by Knight, and he said that he had supported Knight's preliminary decision to terminate Henson. (Pl.'s Ex. 16; Normore Depo. p.39.) Normore also told the EEOC investigator that "the straw that broke the camels [sic] back occurred while [Henson] was on leave" when Knight discovered that several jobs Henson said were complete were not. (Pl.'s Ex. 16.) "This conflicting testimony is different from the type of 'shifting explanation' that [the Eighth Circuit has] said would give rise to an inference of pretext." *E.E.O.C. v. Trans States Airlines, Inc.*, 462 F.3d 987, 995 (8th Cir. 2006) (noting that the change in position must be substantial). Although this final incident was not

14

specifically mentioned in Henson's termination letter, HBC has consistently maintained that it terminated Henson for poor performance as a team leader.

In addition, there is no evidence to suggest that HBC deviated from its termination policies in its dealings with Henson. Normore testified that HBC does not have a defined policy for disciplining salaried employees like Henson. (Normore Depo. p.23.) Before terminating an employee, supervisors generally "make sure they have at least counseled with the employee to make them aware that their performance or behavior is not acceptable." (*Id.* at 24.) Ultimately, however, "leaders exercise discretion." (*Id.*) Henson acknowledged that Knight counseled him on several occasions prior to his termination. On one occasion, Knight told Henson that he appeared to be stressed out and needed to find some way to channel his emotions. (Henson Depo. p.42.) On another occasion, Knight counseled Henson not to touch or hug female employees. (*Id.* at 70-71.) Knight also expressed concern to Henson that his shops were not clean or tidy. (*Id.* at 97-98.) Prior to terminating Henson, Knight made clear to Henson that certain behaviors were unacceptable.

Finally, Henson has not demonstrated that a similarly situated employee at HBC received more favorable treatment than did Henson. The burden for establishing "similarly situated" at the pretext stage is rigorous; the plaintiff must prove that he was similarly situated to another employee in "all relevant aspects." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005). Knight transferred rather than terminated a team leader in the Finish Shop who, like Henson, demonstrated poor performance as a team leader. (Knight Depo. pp.40-41.) However, that team leader, unlike Henson, "had a very positive attitude . . . and really did try." (*Id.* at 40.) An employee's attitude toward his work is a relevant consideration when deciding whether to terminate or transfer the employee. According to Knight, Henson said he did not care about how the airplanes were

15

progressing. (Defs.' Ex. 7 ¶20.) Henson was short-tempered and irritable at work (Knight Depo. p.88), and Knight told Henson on one occasion that he needed to find some way to channel his emotions. (Henson Depo. p.42.) Given this distinction between Henson's attitude toward his work and that of the other team leader, the two were not similarly situated in all relevant aspects. Because Henson has failed to present any evidence that HBC's proffered reasons for his termination are pretext for retaliation, HBC is entitled to summary judgment on Henson's retaliation claim.

### 2. Interference Claim

Henson also alleges that HBC interfered with his rights under the FMLA. Under the interference theory, an employee can recover if he was denied substantive rights under the FMLA for a reason connected with his FMLA leave. *Stallings*, 447 F.3d at 1050; *Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 877 (10th Cir. 2004). "[E]very discharge of an employee while [he] is taking FMLA leave interferes with an employee's FMLA rights." *See Bacon v. Hennepin County Med. Ctr.*, 550 F.3d 711, 715 (8th Cir. 2008) (citing *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 980 (8th Cir. 2005)). That said, "an employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights." *Id.* (citing *Throneberry*, 403 F.3d at 977).

Even assuming that Henson has established that he was entitled to FMLA leave—an issue that is in dispute—his interference claim fails because Henson would have been terminated regardless of his FMLA leave request. "A reason for dismissal that is unrelated to a request for an FMLA leave will not support recovery under an interference theory." *Bones*, 366 F.3d at 877 (citing *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998) (to withstand summary judgment on an interference theory, an employee's termination must have been related to her request

16

for FMLA leave); *see* 29 C.F.R. § 825.216(a) (noting that employee may be laid off or refused return to shift that has been eliminated, as longa s the action would have been taken in the absence of the FMLA leave); *Throneberry*, 403 F.3d at 979 (adopting the Tenth Circuit's approach and placing the burden on the employer to prove that it would have dismissed the employee regardless of her taking FMLA leave). The burden is on the employer to prove that the employee would have been dismissed regardless of the employee's request for, or taking of, FMLA leave. *Throneberry*, 403 F.3d at 979 (adopting the Tenth Circuit's approach); *Bones*, 366 F.3d at 878 (granting summary judgment for the defendant since "[n]o reasonable juror could deduce from the . . . evidence that [the plaintiff's] termination was related to her request for an FMLA leave").

Henson alleges that HBC interfered with his rights by terminating his employment before his request for FMLA leave was granted. But the evidence discussed *supra* indicates that Henson would have been terminated for poor performance regardless of whether he took FMLA leave. HBC is entitled to summary judgment on his interference claim.

**C.     ADA Claims**

ADA claims are analyzed under the well-known *McDonnell Douglas* burden-shifting framework. *Burchett v. Target Corp.*, 340 F.3d 510, 516 (8th Cir. 2003). In an ADA discrimination claim, the plaintiff must establish a *prima facie* case of discrimination by providing evidence that he (1) has a disability within the meaning of the ADA, (2) was qualified to perform the essential functions of his job, and (3) suffered an adverse employment action as a result of his disability. *Id.* A "disability" under the ADA is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (2008). In an ADA retaliation

claim, retaliation, the plaintiff must proffer evidence (1) that he engaged in statutorily protected activity; (2) that adverse action was taken against him; and (3) that a causal connection exists between the adverse action and the protected activity. .*Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007). In both claims, if the defendant can articulate a legitimate, nondiscriminatory reason for its conduct, the burden shifts back to the plaintiff to show the reason is pretextual by presenting evidence regarding the employer's specific intent to interfere or retaliate. *Stewart*, 481 F.3d at 1043 (retaliation claim); *Regel v. K-Mart Corp.*, 190 F.3d 876, 880 (8th Cir. 1999) (interference claim).

As with Henson's FMLA claims, here there is a factual dispute as to whether Henson gave HBC enough information prior to his termination to adequately inform HBC that he was disabled. Henson admits that, in his conversations with Knight, he did not use the term "disability." Rather, he complained to Knight about his work load and told him that he was stressed out. Henson submitted as evidence two emails[4] in which he complained to Normore and Lusk about Knight and requested a transfer or a decreased work load. In neither email does Henson suggest that he is suffering from depression or is otherwise disabled. However, Henson argues that he faxed his FMLA leave request form to HBC on May 23, 2008. The form stated that Henson went to the doctor on May 22, 2008, and was instructed to start a regimen of medication to treat his stress, which was causing depression, anxiety, migraine headaches, and insomnia, and that he would need to take one to two weeks off of work to allow the medication to take effect. (Defs.' Ex. 14.) That is sufficient to create a genuine issue of material fact as to whether HBC knew of Henson's disability.

Regardless whether Henson can establish a *prima facie* case of discrimination or retaliation

---

[4]There is a fact question as to whether Lusk or Normore ever received those emails.

under the ADA, as explained in the FMLA section *supra*, Henson has failed to provide any evidence that the stated reasons for Henson's termination were pretext for discrimination or retaliation. Thus, HBC is entitled to summary judgment on Henson's ADA claims.

**D.     ACRA Claim**

HBC also is entitled to summary judgment on Henson's ACRA claim. According to the Act,

> (a)     The right of an otherwise qualified person to be free from discrimination because of race, religion, national origin, gender, or the presence of any sensory, mental, or physical disability is recognized as and declared to be a civil right. This right shall include, but not be limited to:
>
> (1)     The right to obtain and hold employment without discrimination; . . . .

Ark. Code Ann. § 16-123-107. Courts "analyze a disability claim presented under the ACRA using the same principles employed in analyzing claims under the [ADA]." *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002); *see* Ark. Code Ann. § 16-123-105(c). Because Henson fails meet his burden of establishing pretext under the ADA, HBC is entitled to summary judgment on the plaintiff's ACRA claim.

## CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is GRANTED. Document #20.

IT IS SO ORDERED this 10th day of August, 2010.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE